KUSKIN, J.T.C.
Plaintiff, L & L Oil Service,.Inc. (“L & L”), is engaged in the business of collecting waste oil, sludge, and anti-freeze from gasoline service stations, automobile dealers, industrial properties, and, on a less frequent basis, residential properties. Defendant, Director of the New Jersey Division of Taxation (“Director”), determined that plaintiffs business constituted “maintaining, servicing or repairing real property” under N.J.S.A. 54:32B-3(b)(4) or “maintaining, servicing [or] repairing tangible personal property” under N.J.S.A. 54:32B-3(b)(2) and assessed sales tax under the New Jersey Sales and Use Tax Act, N.J.S.A 54:32B-1 to -29, for the period January 1990 through December 1992 (the “audit period”) in the amount of $52,773.33, plus interest. L & L appeals the Director’s assessment.
The following facts are either stipulated or not in dispute. L & L is a New Jersey corporation with its principal place of business *517 in New Jersey. L & L pumps waste oil, sludge and anti-freeze (collectively the “waste materials”) from storage tanks at gasoline service stations, automobile dealers, industrial properties, and, on a less frequent basis, residential properties, into tanks on L & L’s trucks. The capacity of the tanks pumped ranged from 275 to 1,000,000 gallons. On occasion, after pumping a commercial customer’s tank, L & L cleaned the tank. The trucks transported the waste materials to L & L’s facility in New Jersey, where the trucks were unloaded, and the waste materials were either purified or processed for resale. Purifying or processing the waste materials generally entailed separating water and oil from the sludge and disposing of the water. L & L sold the separated oil to another company, but such sales are not the subject of the assessment of taxes at issue in this appeal.
L & L’s customers paid it for the service of pumping their tanks and removing waste materials. L & L generally charged a lump sum price for the pumping and removal service, although a few invoices during the audit period included a separate transportation charge. L & L generally did not charge sales tax in connection with the pumping and removal service, although it did charge the tax on a few occasions during the audit period.
On June 27, 1994, the Director issued a Notice of Assessment for Sales and Use Tax in the amount of $305,032, plus interest to July 20, 1994 of $100,173, for a total of $405,205. As a result of documentation provided by L & L, the Director reduced the assessment and issued a Final Determination on July 9, 1997 indicating liability for Sales and Use Tax in the amount of $97,773.33, plus interest to August 20, 1997 of $36,678.88, for a total of $134,452.21. L & L made a partial payment on June 1, 1996 in the amount of $45,000, so that the balance of tax claimed by the Director, exclusive of interest, is in the amount of $52,-773.33.
L & L contends that the services it provided did not constitute the maintenance, repair or servicing of the tanks from which the waste materials were pumped. L & L asserts that the pumping of waste materials from tanks was part of an integrated operation *518 involving the acquisition of raw materials from tanks, and the processing and sale of thóse materials. L & L also contends that the definitions relating to repair and maintenance of tanks contained in statutes and regulations applicable to the New Jersey Department of Environmental Protection (“DEP”) should be utilized in interpreting N.j.S.A. 54:32B-3(b)(2) and (4), that L & L was not licensed to repair and maintain tanks pursuant to such statutes and regulations, and that, as a result, L & L’s services cannot, and do not, constitute services subject to sales and use tax. Additionally, L & L contends that the waste materials constituted hazardous waste under definitions promulgated by DEP, and the New Jersey Division of Taxation has consistently ruled that payments for the removal of hazardous waste from real property are not subject to sales and use tax.
The Director argues that, by pumping waste materials from customers’ tanks, L & L enabled the tanks to continue to be used for the storage of additional waste materials, and, therefore, the pumping service constituted the maintenance or servicing of the tanks for sales and use tax purposes, whether the tanks constituted real property or tangible personal property. The Director asserts that the use to which the waste materials were put after removal from the tanks does not affect the taxability of the removal service. Additionally, the Director argues that statutes relating to DEP are irrelevant to a determination of taxability under the Sales and Use Tax Act. Lastly, the Director disputes L & L’s contention that the removal of hazardous waste is excluded or exempt from taxation, noting that the Division of Taxation has exempted the clean-up of hazardous waste from real property from sales and use tax on the basis that such clean-up constitutes a capital improvement to the property. The Director asserts that the services which L & L performed did not constitute capital improvements because they do not in any way improve or enhance the tanks or the real property in which the tanks were located. These services, according to the Director, simply enabled the tanks to be reused for the same purposes.
*519 In supplementation of the stipulated facts, L & L presented the testimony of three witnesses. One, who qualified as an expert witness, testified to the applicable requirements of DEP for licensure in order to engage in the repair and maintenance of tanks. The witness opined that, if L & L in fact performed repairs to or maintenance of tanks, it would have been required to obtain an appropriate license from DEP. The witness further testified that, based on his examination of L & L’s facility, L & L was not engaged in repair and maintenance work but rather was engaged in the processing of hazardous waste for sale. Finally, the witness testified that L & L did not perform any services which prevented the decline in the condition of the tanks or which restored or improved the condition of the tanks.
L & L’s second witness was its vice-president, who described the nature of the company’s operations. He explained that truck drivers working for L & L attempted to get new accounts and were paid on a commission basis relating to the number of gallons of waste materials pumped. The witness further testified that pumping of a gasoline service station’s tanks usually took place twelve to fourteen times per year, and that most of the tanks pumped had capacities of between 275 and 1,000 gallons. The witness testified that, during the audit period, L & L had a hazardous waste transportation license from DEP, but no license to repair or maintain tanks, and that L & L’s drivers were not licensed to repair or maintain tanks. The witness acknowledged that pumping waste materials from a tank enabled the tank to be re-used for the storage of waste materials. Additionally, the witness testified that, if material pumped from a customer’s tank did not meet standards for processing by L & L, the company would communicate with the customer and arrange for disposal of the waste material. The customer could be required to pay an additional charge for this service. On rare occasions, according to the witness, L & L returned waste material to a customer because the material wus unsuitable for processing by L & L, and L & L could not arrange for disposal.
*520 L & L’s final witness was its accountant who testified that, for accounting purposes, receipts from services involving pumping and removal of waste materials were treated by L & L not as income but as a reduction in the cost of goods sold. When the processed material was sold, the net price would be determined by a deduction from the sales price of the costs of preparing the material, and those costs were reduced by the amount of the payment received by L & L from the customers from which the material was obtained. The accountant testified that L & L rejected waste materials once or twice per month. (L & L’s vice-president testified that only ten to thirty rejections occurred over the past fifteen years.) The witness also testified that, when serving as accountant for gasoline service stations, he treated payments for removal of waste oil and other products from storage tanks as a business expense and not as a cost of goods sold.
The statutes pursuant to which the Director assessed Sales and Use Tax, N.J.S.A. 54:32B-3(b)(2) and (4), provide, in relevant part, as follows:
There is imposed and there shall be paid a tax of 6% upon:
(b) The receipts from every sale, except for resale, of the following services:
(2) Installing tangible personal property, or maintaining, servicing, repairing tangible personal property not held for sale in the regular course of business ... except ... (v) services rendered in installing property which, when installed, will constitute an addition or capital improvement to real property, property or land.
(4) Maintaining, servicing or repairing real property ... whether the services are performed in or outside of a building, as distinguished from adding to or improving such real property by a capital improvement, but excluding ... garbage removal and sewer services performed on a regular contractual basis for a term not less than 30 days.
The only reported opinion construing the phrase “maintaining, servicing or repairing” in the sales and use tax context is Newman v. Director, Div. of Taxation, 14 N.J.Tax 313 (Tax 1994), aff’d o.b., 15 N.J.Tax 228 (App.Div.1995). In determining that hardwood floor refinishing services were taxable under Section (b)(4) quoted above, the Tax Court employed the dictionary definitions of the words maintain, service and repair.
*521 “Maintain” is defined in Webster’s Seventh New Collegiate Dictionary (G. & C. Mernarn Co.1967) as “to keep in an existing state” or “preserve from failure or decline.” “Repair” is defined as “to restore by replacing' a part or putting together what is torn or broken; fix” or “to restore to a sound or healthy state; renew.” “Service” is defined as “to repair or provide maintenance for.”
[Id. at 323.]
In support of its contention that the services it provides are not subject to tax under either (b)(2) or (b)(4), L & L relies primarily on definitions of maintain, service and repair derived from decisions of courts and administrative agencies of the State of New York. The Tax Court has frequently recognized that the New Jersey Sales and Use Tax legislation was derived from New York statutes, and that New York cases and other interpretations of the New York statutes are useful to, although not binding upon, New Jersey Courts in interpreting the New Jersey Sales and Use Act. Id. at 321. The New York Sales Tax statutes contain provisions similar to the quoted provisions from N.J.S.A. 54:32B-3(b)(2) and (4). These provisions appear in New York Tax Law § 1105(c)(3) and (5) (McKinney). Paragraph (c)(3) imposes tax on “maintaining, servicing or repairing tangible personal property ... not held for sale in the regular course of business, ... except: ... (iii) for installing property which, when installed, will constitute an addition or capital improvement to real property, property or land.... ” Paragraph (c)(5) imposes tax on “[mjaintaining, servicing or repairing real property, property or land, ... whether the services are performed in or outside of a building, as distinguished from adding to or improving such real property, property or land, by a capital improvement.... ”
In the context of tangible personal property, the phrase “maintaining, servicing or repairing” as used in the New York statute has been defined by administrative regulation as consisting of “terms used to cover all activities that relate to keeping tangible personal property in a condition of fitness, efficiency, readiness or safety or restoring it to such condition.” 20 N.Y.C.R.R. 527.5(a)(3). In the context of real property, the phrase has been defined by regulation as consisting of:
terms which are used to cover all activities that relate to keeping real property in a condition of fitness, efficiency, readiness or safety or restoring it to such condition. *522 Among the services included are sendees on a building itself such as painting; sendees to the grounds, such as lawn services, tree removal and spraying; trash and garbage removal and sewerage service and snow removal.
[20 N.YC.R.R. 527.7(a)(1).]
N.J.S.A. 54:32B-3(b)(4) differs from the New-York Tax Law § 1105(e)(5) and the regulation interpreting the statute in that, in New Jersey, “garbage removal and sewer services performed on a regular contractual basis for a term not less than 30 days” are excluded from taxation. Such services are taxable in New York.
The New York cases and administrative rulings on which plaintiff relies interpret the phrase “maintaining, servicing and repairing” in the context of removal of waste from real property. The critical factor in these rulings was whether the removal related to valueless trash or to material having some inherent value.
In In re Seneca Foods Corp., 1995 WL 416504 (N.Y. Tax App. Trib.1995), the issue was whether payments made by Seneca Foods for removal of food by-products and sludge from its plant constituted payments made for trash or garbage removal and, therefore, subject to tax under Tax Law § 1105(c)(5). During the tax period in question, one farmer removed by-products from the company’s processing plant, charging $10 per ton, and fed the byproducts to cows. Another farmer removed the sludge, charging $11.59 per ton, and used the sludge as fertilizer. The New Yprk Tax Appeals Tribunal determined that the crux of the issue before it was whether the food by-products and sludge had value. If not, then the removal constituted the removal of trash subject to tax. If, however, the by-products and sludge had value, their removal would not be taxable. The Tribunal concluded that the “value” of the material need not be to the person initially holding the material but could be to the party removing the material, and that the food by-products and sludge had value to the farmers. The Tribunal noted that the farmers’ charges for removal were significantly lower than the per ton charge paid by Seneca Foods for waste removal by a sanitation company, thus reflecting the value of the food by-products and sludge. In its opinion, the Tribunal specifically noted that “[djuring the period at issue, petitioner did not maintain storage facilities for food by-products.” Id. at *6.
*523 In In re Marisol, Inc., 1996 WL 11836 (N.Y. Tax App. Trib. 1996), the Tax Appeals Tribunal considered the taxability of the removal of chemical waste. A company desiring to have chemical waste removed contacted Marisol and the price for removal was then negotiated. The price was a function of the type of material, the market value for the recovered material, and Marisol’s expected profit. Before removal of the chemical waste, Marisol analyzed a sample of the waste to ensure that the company was authorized to handle the waste and that the waste was recyclable. Once Marisol determined that the waste was acceptable, it arranged for one of its trucks or a common carrier to pick up and transport the waste to Marisol’s plant where the waste was recycled. The waste material arrived at the plant either in bulk tank wagons or fifty-five-gallon drums. Marisol paid the customer for the chemical waste, although the transportation charges the customer was required to pay to Marisol sometimes exceeded the payment by Marisol to the customer. The Tax Appeals Tribunal noted that the chemical waste remained the property of the customer until it was analyzed for content at Marisol’s plant and accepted. In deciding that Marisol’s chemical waste removal services did not constitute “maintaining, servicing or repairing real property,” the Tribunal relied heavily on its decision in Seneca Foods. The Tribunal also relied on Tonawanda Tank Transport Service, Inc. v. Tax App. Tribunal, 168 A.D.2A 748, 563 N.Y.S.2d 900 (1990), in which the New York Appellate Division determined that abandonment of property by its owner was not a prerequisite to having the property constitute trash for sales tax purposes. The Tax Appeals Tribunal in Marisol concluded:
Hero, like in Seneca Foods, it is dear that the materials had economic value to petitioner. The only chemicals accepted by petitioner were those for which it had a market. As petitioner’s witness testified, the price paid by the customer or to the customer was dictated by the cost to recover the material, the market for the recovered material and petitioner’s anticipated profit. Petitioner is in the business of reclaiming and reselling' chemicals, not the removal and transport of trash and garbage for mere disposal. Thus, we conclude that the materials removed and transported by petitioner from its New York customers were not “trash” within the meaning of Tax haw § 1105(c)(5).
[In re Marisol, supra at *9.]
*524 In a 1997 Advisory Opinion consistent with Seneca Foods and Marisol (but inconsistent with a 1996 advisory opinion discussed below), the New York Department of Taxation and Finance determined that fees charged by a company for picking up metal cans, plastic bottles and glass bottles from customers, which the company then recycled, were r.«t subject to tax because the receipts were not from the service of maintaining real property, property or land. The opinion categorized the cans and bottles as “raw materials” from which the company generated revenue. Advisory Opinion, Petition No. S951023A, 1997 WL 538730 (N.Y.Dept.Tax. Fin. July 23,1997).
The accuracy and reliability of the interpretation of New York Tax Law § 1105(c)(5) contained in the Seneca Foods and Marisol decisions, and the 1997 Advisory Opinion, is cast into doubt by other New York administrative decisions and by decisions of the New York courts. For example, in a 1996 advisory opinion, issued after both Seneca Foods and Marisol had been decided, the New York Department of Taxation and Finance determined that payments to a trucking company to remove and transport to a sanitary landfill “shredder fluff,” produced by the shredding of glass, plastic and upholstery of automobiles, were subject to sales tax. In reaching his conclusion, the Commissioner reviewed the determinations by the Tax Appeals Tribunal in Seneca Foods, particularly the determination that the taxability of the payment depended on whether, under Tax Law § 1105(c)(5), the material in question was “trash” or had value. The Department concluded:
The decision in Seneca Foods and the case law upon which it was based suggest that trash and items of value are mutually exclusive. However, given today’s recycling and resource recovery efforts very little, if any, trash has no value. This calls into question the use of the term “trash” in relation to petitioner and Section 1105(c)(5) of the Tax Law
Semantics aside, trash and garbage removal services are only one example of the services of maintaining, servicing or repairing x-eal pi-opei’ty, property or land as set fox-th in Section 527.7 of the regulations. Regardless of the value of shredder fluff as daily cover material at the landfill, the removal and transportation of this fluff constitutes the x-emoval and transportation of solid waste, as defined in the Environmental Conservation Law, from Petitioner’s place of business to a landfill and these activities are related to keeping Petitioner’s real property in a condition *525 of fitness, efficiency, readiness and safety or restoring it to these conditions. Accordingly, payments made by Petitioner for the transportation of shredder fluff are subject to sales tax pursuant to Section 1105(e)(5) of the Tax Law.
[Advisory Opinion, Petition No. S960229A, 1996 WL 617214, *2-*3 (N.Y.Dept. Tax.Fin. Oct. 1, 1996).]
This Advisory Opinion was not mentioned in the 1997 Advisory Opinion described above relating to cans and bottles.
The New York courts, when considering issues similar to those before the Tax Appeals Tribunal in Seneca Foods and Marisol, have taken a much more expansive view of taxability than appeal's in the Seneca Foods and Marisol rulings. The court decisions are generally consistent with the 1996 Advisory Opinion. In Cecos Int’l., Inc. v. State Tax Comm’n, 71 N.Y.2d 934, 528 N.Y.S.2d 811, 524 N.E.2d 132 (1988), the New York Court of Appeals held that charges imposed by CECOS for the disposal of hazardous waste were subject to sales tax. CECOS either arranged with independent haulers to transport waste material from customers’ sites to CECOS’ facility, using haulers designated by the customer or selected by CECOS. In the latter event, CECOS imposed a five to ten percent surcharge over the price charged by the hauler. The Court affirmed the determination by the New York Tax Commission that “petitioner’s freight and disposal charges constituted the taxable maintenance service of trash removal from buildings (Tax Law § 1105[c][5] ...). By arranging for the hauling of the waste to its facilities, and in fact applying a 5% to 10% surcharge, petitioner has performed this taxable service and it cannot, by merely separating the disposal and freight costs on its invoices, render the freight portion of the charges non-taxable.” Id. at 133-134 (citations omitted). On the same date, the Court of Appeals reached a similar conclusion in Rochester Gas and Elec. Corp. v. New York State Tax Comm’n, 71 N.Y.2d 931, 528 N.Y.S.2d 810, 524 N.E.2d 131 (1988). This matter involved the taxability of payments by Rochester Gas and Electric to independent haulers who collected, transported and disposed of industrial fly ash, a waste product of coal combustion. The parties conceded that fly ash was not “trash” but had little or no economic value. The Court concluded that “the removal of fly ash from petitioner’s power generating plants is unquestionably a maintenance service *526 to real property, which is enumerated as an item subject to taxation,” Id. at 132, and that
the collection, hauling and disposal of the fly ash constitutes an integrated sendee taxable under the plain language of Section 1105(c)(5). The removal of fly ash to landfills is neither the transportation of a useful product from one location to another, nor an. integral step in the erection of a capital improvement.
[Ibid, (citations omitted).]
In In re Tonawanda, Tank Transport Service, Inc. v. Tax Appeals Tribunal, 168 A.D.2d 748, 563 N.Y.S.2d 900 (1990), a decision which, as discussed above, the New York' Tax Appeals Tribunal relied on in Seneca Foods and Marisol, the court held that hazardous waste was equivalent to trash under the Tax Law, and, relying on CECOS and Rochester Gas, the court had “no trouble in concluding that petitioner’s activities in collecting, hauling and delivering hazardous waste ‘constitutes an integrated service taxable under the plain language of § 1105(c)(5).’ ” Id. at 901 (citation omitted).
Decisions, other than Seneca Foods and Marisol, made by the New York Division of Tax Appeals and Tax Appeals Tribunal are consistent with the foregoing court rulings. In In re Olin Corp., 1996 WL 306703 (N.Y. Div. Tax App.1996), a decision rendered after Seneca Foods, the New York Division of Tax Appeals held that the pick-up and transport of hazardous waste from Olin’s plants by a transporter who had the responsibility to “take delivery, treat, store and/or otherwise dispose of’ the waste products, Id. at *2, was an integrated waste removal service subject to sales tax under New York Tax Law § 1105(c)(5), although the portion of the receipts allocable to out-of-state services for processing and disposal were not subject to taxation in New York. In reaching this conclusion, the Division of Tax Appeals relied on decisions of the New York Tax Appeals Tribunal in In re General Electric Co., 1992 WL 51149 (N.Y. Tax App. Trib.1992), In re Bristol-Meyers Co. Indus. Div., 1994 WL 518879 (N.Y. Tax App. Trib.1994), and In re Waste Conversion, Inc., 1994 WL 479343 (N.Y.Tax.App.Trib.1994). In each of these decisions,the Tax Appeals Tribunal concluded that the services provided constituted an integrated hazardous waste removal service. The *527 taxpayer in each matter conceded that charges for removal and transportation of the wastes were taxable, but disputed the imposition of sales tax on charges for treatment or processing services which took place outside the State of New York. The Tax Appeals Tribunal held that, under the Commerce Clause of the United States Constitution, New York could not tax the fees attributable to processing services performed out-of-state.
As noted above, the New York statute, Tax Law § 1105(c)(5), differs from the parallel New Jersey statute N.J.S.A. 54:32B-3(b)(4) in that, under the New Jersey statute, regular trash removal services are excluded from taxation. What the foregoing New York decisions demonstrate, however, is that, even if a waste hauler is providing an integrated service of waste removal and processing, the entire fee received by the hauler (assuming no Commerce Clause problems interfere) is taxable. No allocation of the fee between (1) pick-up and removal services and (2) transportation services is required. A second noteworthy aspect of the New York decisions is that none discusses waste removal from a tank which is then reused for the storage of additional waste material, . as occurs in connection with the services provided by L & L.
In Newman v. Director, Division of Taxation, supra, 14 N.J. Tax 313, the Tax Court held that refinishing of hardwood floors constituted maintenance, service or repair of real property within the context of N.J.S.A. 54:32B-3(b)(4) because ‘Tp]laintiffs refinishing sendees consist of procedures which ‘renew’ the finish of the floor, presumably restoring it to a condition similar to that which existed when the floor was first installed.” Id. at 323. The removal of waste materials from customers’ storage tanks by L & L, in effect, “renewed” the tanks. Although, on occasion, L & L provided cleaning services, it did not otherwise service the tanks. The mere removal of the waste materials, however, permitted the continued use of the tanks for their intended purpose, whether the tanks constituted real property or personal property, and, therefore, such removal constituted “maintenance” or “servicing” of the tanks under N.J.S.A 54:32B-3(b)(2) and (4). In the words of the *528 New York Regulations quoted above, the services provided by L & L constituted “activities that relate to keeping real property [or tangible personal property] in a condition of fitness, efficiency, readiness or safety or restoring it to such condition.” The fees received by plaintiff for its waste removal services, therefore, are taxable.
In reaching my conclusion as to taxability, I reject L & L’s contention that its removal of waste products was merely a method of acquiring raw materials which were recycled and processed for resale as part of an integrated waste treatment business. The fees charged by L & L, which the Director seeks to tax, were unrelated to L & L’s processing and resale operations. The fees did not vary based on the resale value, after processing, of the waste materials (L & L argued in its pre-trial brief that such a relationship existed, but presented no proof to support the argument), and L & L’s customers had no other interest in what disposition or use L & L made of the waste materials. Customers paid fees to L & L only for the service of pumping and removal of waste materials. Because these fees related to discrete transactions between L & L and its customers, the fees are taxable even if L & L’s business constituted an integrated waste removal, processing, and resale operation. See D.P.S. Acquisitions Corp. v. Director, New Jersey Div. of Taxation, 17 N.J.Tax 592, 593 (App.Div.1998) (rejecting the argument that parking lot sweeping services were exempt from sales tax under N.J.S.A. 54:32B-3(b)(4) because they were part of an integrated garbage removal service.)
If L & L’s contentions as to the significance, for sales tax purposes, of an integrated operation were extended to then logical extreme, all services involving the removal of materials which are then recycled or resold by the remover would not be taxable. For example, if a gardener removed grass clippings which were resold as fertilizer, the grass cutting service would not be taxable, and if a person cleaning roof gutters sold the decayed leaves as compost, the gutter cleaning service would not be taxable. Such results would be, and L & L’s contentions are, inconsistent with 1) the intent and broad scope of the Sales and Use Tax Act, which *529 contains a presumption of taxability, N.J.S.A. 54:32B-12(b), and 2) the New York court and administrative decisions discussed above, which permitted sales and use tax to be imposed on waste removal and transport services which were parts of integrated operations including recycling of the waste and sale of recycled materials.
In an effort to demonstrate that the transactions between L & L and its tank pumping customers were not complete upon the removal of the waste materials, L & L presented testimony that, on occasion, it had rejected materials removed from customer’s tanks. In such event, according to the testimony, L & L arranged for disposal of the materials, and sometimes imposed an additional charge on the customer. On rare occasions, according to the testimony, L & L returned the waste materials to the customer. Because L & L presented no proof to support its generalized claim as to extra disposal fees, I find the testimony as to such fees to be unconvincing. I find wholly incredible the testimony by plaintiffs vice-president that waste materials were returned to customers and redeposited in their tanks. First, such a return would seem to be physically difficult because, undoubtedly, additional waste materials would have accumulated in the customer’s tank. Second, it is inconceivable that the customer, having paid the fee for removal, would accept a return of its waste materials. Third, although not evidence, L & L’s pre-trial brief asserted repeatedly and emphatically that L & L was the owner of the waste materials upon pick-up. These assertions suggest that the testimony as to rejection and return of waste materials was molded to suit a theory of non-taxability developed by L & L for purposes of trial.
In addition to rejecting L & L’s integrated operation argument, I reject L & L’s contention that its tank pumping seivices cannot constitute maintenance or repair of real or tangible personal property because L & L did not have licenses from DEP to perform maintenance or repair of storage tanks. This contention assumes that the statutes administered by DEP regulating underground storage of hazardous substances and underground storage tanks, N.J.S.A. 58:10A-21 to -24 and N.J.S.A. *530 58:10A-24.1 to -24.6 (the “DEP Tank Statutes”), and the Sales and Use Tax Act are in pari materia.
Statutes are in pari materia when they have “the same purpose or object.” Richard’s Auto City, Inc. v. Director, Div. of Taxation, 140 N.J. 523, 540, 659 A.2d 1360 (1995) (citations omitted). The DEP Tank Statutes and the Sales and Use Tax Act have an entirely different history and entirely different purposes and objects. The provisions in the Sales and Use Tax Act imposing tax on maintaining, servicing or repairing property, N.J.S.A. 54:32B-3(b)(2) and (4), were enacted in 1966, L. 1966, c. 30, § 3, long before enactment of the DEP Tank Statutes on which L & L relies, and have not been altered by the Legislature except for insertion and deletion of exceptions to taxability. See L. 1966, c. 53, § 1 (deleting exception for trash removal from buildings) and L. 1990, c. 40, § 2 (omitting exclusion for interior cleaning and maintenance services and omitting reference to window cleaning and rodent and pest control). The DEP Tank Statutes were enacted in 1986 and 1991. Them purpose was to address groundwater pollution. The Statutes resulted from a legislative finding that millions of gallons of gasoline and similar substances were stored in underground storage tanks, that .many of the tanks were leaking due to corrosion or structural defects, and that the leakage was a significant cause of groundwater pollution. The Legislature concluded that it was “necessary to provide for the registration and the systematic testing and monitoring of underground storage tanks to detect leaks and discharges as early as possible and thus minimize further degradation of potable water supplies.” N.J.S.A. 58:10A-21.
Our courts- have consistently refused to construe statutes in pari materia when them history and purposes are as divergent as the DEP Tank Statutes and the Sales and Use Tax Act. See International Flavors & Fragrances, Inc. v. Director, Div. of Taxation, 102 N.J. 210, 219 n. 5, 507 A.2d 700 (1986) (holding that the Business Corporation Act and the Corporation Business Tax Act should not be read in pari materia and- declining to engraft the definition of “subsidiary” from one Act onto the other); see *531 also Richard’s Auto City, Inc. v. Director, Div. of Taxation, supra, 140 N.J. at 540-41, 659 A.2d 1360 (declining to read the Business Corporation Act and the Corporation Business Tax Act in pari materia); Marrinan v. State, Division of Taxation, 17 N.J. Tax 47, 55 (Tax 1997) (declining to engraft provisions from Corporation Business Tax Act onto the Gross Income Tax Act); Cooperstein v. State Division of Taxation, 13 N.J.Tax 68, 93 (Tax 1993), aff’d, 14 N.J.Tax 192 (App.Div.1994), certif. denied, 140 N.J. 329, 658 A.2d 728 (1995) (declining to read the Business Corporation Act in pari materia with the Sales and Use Tax Act or the Gross Income Tax Act).
Based on the preceding discussion, I conclude that the DEP Tank Statutes and the Sales and Use Tax Act are not in pari materia. The DEP Tank Statutes do not incorporate or refer to any provisions of the Sales and Use Tax Act, and the Act does not incorporate or refer to any provisions of the Statutes. Consequently, the DEP Tank Statutes are not relevant to issues of taxability under the Sales and Use Tax Act, and the fact that L & L did not obtain a repair or maintenance license from DEP, even if such a license was required (I make no ruling on this issue), does not preclude L & L’s tank pumping services from constituting the maintaining and servicing of real or tangible personal property for taxation purposes. Cf. Byram Tp. v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988) (stating that “it is not at all obvious that uses that might satisfy the minimal requirements of the Farmland Assessment Act would per se constitute agricultural or farming uses for zoning or other local land use purposes.... ” Id. at 232, 544 A.2d 37).
In determining that L & L’s pumping and removal services are taxable, I also reject L & L’s contention that, because its services involved removal and transpiration of hazardous wastes, the services were exempt from taxation. No provision of the Sales and Use Tax Act expressly grants such an exemption, but both N.J.S.A. 54:32-3(b)(2) (relating, to maintaining, servicing and repairing tangible personal property) and N.J.S.A. 54:82B-3(b)(4) (relating to maintaining, servicing and repairing real property) *532 exclude a “capital improvement” from taxation. The term “capital improvement” as used in N.J.S.A. 54:32B-3(b)(4) refers to “an installation of tangible personal property which results in an increase of the capital value of the real property or a significant increase in the useful life of such property.” N.J.A.C. 18:24-5-.16(a)(6)(i). See also N.J.A.C. 18:24-5.7(a). The same definition is applicable under N.J.S.A. 54:32B-3(b)(2). See Newman v. Director, Div. of Taxation, supra, 14 N.J. Tax at 324-30. Even L & L’s expert witness acknowledged that L & L’s services did not improve the condition of customers’ storage tanks, and L & L presented no proof that its services enhanced the value of the real property in which the tanks were located. L & L’s services do not satisfy the definition of capital improvements. See Rochester Gas and Elec. Corp. v. New York State Tax Comm’n., supra, 528 N.Y.S.2d 810, 524 N.E.2d at 132. Consequently, L & L’s pumping, removal, and transportation services, as such, even if involving hazardous wastes, are not excluded or exempt from sales and use tax.
Lastly, I address L & L’s contention that, even if sales or use tax is determined to be due, the Director should be required, pursuant to N.J.S.A. 54:49—11(b), to waive the payment by L & L of any interest because L & L reasonably relied on erroneous advice furnished by the Division of Taxation. I find no merit to this contention. The statute provides as follows:
The director shall waive the payment of any part of any penalty or any part of any interest attributable to the taxpayer’s reasonable reliance on erroneous advice furnished to the taxpayer in writing by an employee of the Division of Taxation acting in the employee’s official capacity, provided that the penalty or interest did not result from a failure of the taxpayer to provide adequate or accurate information.
[N.J.S.A. 54:49-ll(b).]
L & L cited, as the “erroneous advice” to which the statute refers, various letters from the Division of Taxation in response to inquiries concerning the taxability of certain types of waste removal activities and a paragraph in the March/April 1988 New Jersey State Tax News. None of the inquiry letters fully and accurately described the nature of L & L’s business operations, and neither the responses from the Division of Taxation nor the State Tax *533 News paragraph indicated or suggested that the business activities which L & L actually conducted were not subject to sales and use taxation. L & L is not entitled to relief under N.J.S.A. 54:49-11(b).
Judgment will be entered in favor of the Director and against L & L for the sum of $52,773.83 plus interest to the date of payment.